## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM DEAN CHAPMAN, JR.,<br>ALEXANDER CAPITAL MARKETS, LLC, and<br>ALEXANDER FINANCIAL, LLC,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff United States Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1.      This action involves a fraudulent stock-collateralized loan business run by Alexander Capital Markets, LLC ("ACM"), its affiliate Alexander Financial, LLC ("AF") (collectively with ACM, the "ACM Entities"), and the ACM Entities' principal, founder, and control person, William Dean Chapman, Jr. ("Chapman"). Chapman and the ACM Entities raised millions of dollars from hundreds of individuals by holding themselves out as lenders offering loans to borrowers able to collateralize their loans with stock in publicly traded companies. Specifically, the Defendants raised the money by inducing borrowers to transfer ownership of millions of shares of publicly traded securities to them as collateral for purported non-recourse loans ("Stock-Based Loans") that, by no later than 2006, were based on false promises, including the promise to return the shares, or remit share profits in excess of accrued interest ("net appreciation"), to borrowers who repaid their loans at term end.

2.      Chapman and the ACM Entities typically agreed to loan to borrowers ten to fifteen percent less than the market value of the shares transferred in loan arrangements lasting two to seven years.  The Defendants generally sold all the shares they received from borrowers immediately upon receipt of the securities.  Because Chapman and the ACM Entities loaned the borrowers less than current market value for the securities pledged, they retained substantial proceeds after funding loans.

3.      By no later than June 2006, Chapman and the ACM Entities were doing nothing to ensure their ability to repurchase and return shares, or remit net appreciation, to borrowers who elected to repay their loans.  This was despite the fact that many of the loan agreements entered into by Chapman and the ACM Entities with borrowers ("Contracts") assured borrowers that the defendants would engage in "hedging" strategies, would "hedge," or would enter into contracts with counterparties that would ensure that the stock portfolios used as collateral could be returned.

4.      Chapman and the ACM Entities continued to enter into new Contracts, liquidating securities received as collateral from new borrowers, and failing to take any steps to ensure their ability to satisfy obligations under the new Contracts as they came due.  Instead, the Defendants used the proceeds from sales of securities collateralizing the new Contracts to pay obligations to other borrowers as they came due, pay the ACM Entities' operating costs such as Chapman's purported salary, and otherwise for the benefit of the Defendants.  In so doing, they deliberately or recklessly misrepresented to new borrowers that they could perform under new Contracts.

5.      By early 2007, Chapman and the ACM Entities were unable to honor maturing Contracts.  Undaunted and desperate to obtain new funds, the Defendants thereafter entered into new Contracts under false pretenses.  Defendants also accepted over $2 million in loan

repayments from at least two borrowers, using the funds to repay other borrowers and for Chapman's personal benefit, while failing to return the securities of the borrowers who repaid their loans as required by their Contracts.

6.      In or around June 2009, the ACM Entities ceased offering the Stock-Based Loans to the public and accepting loan repayments.

7.      The total loss resulting from the above described activities of the Defendants exceeds $2.5 million.

8.      Through their actions, Chapman, ACM, and AF violated, and unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].   Defendant Chapman is also liable under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as a control person of ACM and AF.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  Defendants, directly or indirectly, singly or in concert, made use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10.      Venue in this district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, transactions, practices. and courses of business constituting the violations alleged herein occurred within the Eastern District of Pennsylvania.  Among other things, in connection with the fraudulent activities alleged herein, the Defendants solicited

borrowers through an entity with a principal place of business in the Eastern District of Pennsylvania, and certain borrowers resided in that district.

## THE DEFENDANTS

11.     **Defendant William Dean Chapman, Jr.,** age 44, is a resident of Sterling, Virginia. Chapman founded ACM in February 2001 and AF in 2004. At all times relevant to this action, Chapman controlled Defendants ACM and AF.

12.     **Defendant Alexander Capital Markets, LLC** ("ACM") is a Delaware limited liability company. At all times relevant to this action, ACM's principal place of business was in Reston, Virginia, and Chapman owned, controlled, and held himself out as the President of, ACM. In or around 2002, ACM hired an employee (the "Employee") who assisted Chapman in the operations of ACM.

13.     **Defendant Alexander Financial, LLC** ("AF") is a Delaware limited liability corporation located in Virginia that was formed by Chapman and ACM in 2004 to serve borrowers in California and to comply with California insurance reporting and regulatory requirements. At all relevant times, Chapman controlled, and held himself out as the President of, AF. The Employee also assisted Chapman in the operations of AF.

## OTHER INDIVIDUALS AND ENTITIES

14.     **Stock Loan Solicitor I** began as a corporation formed by an individual ("Principal I") in 2001. From November 2005 forward, Stock Loan Solicitor I operated as a limited liability corporation under the laws of the Commonwealth of Pennsylvania with its principal place of business in Philadelphia, PA. Stock Loan Solicitor I solicited borrowers for the Defendants' Stock-Based Loans by advertising the loans and ultimately introducing potential borrowers to the ACM Entities. At least 50 borrowers who ultimately entered into Contracts

with the Defendants were introduced to the Defendants by Stock Loan Solicitor I after November 2005.

15.     **Stock Loan Solicitor II** is a corporation formed by an individual ("Principal II") in 1995 under the laws of Nevada, with a principal place of business in Stamford, Connecticut. Through approximately April 2008, Stock Loan Solicitor II solicited borrowers for the Defendants' Stock-Based Loans by advertising the loans and ultimately introducing potential borrowers to the ACM Entities.

## FACTS

### A.     *The Stock-Based Loans*

16.     In or around early 2000, Chapman was approached by Principal I to develop a loan product designed to provide liquidity to borrowers with existing stock portfolios.   In 2001, Chapman formed ACM in order to offer Stock-Based Loans to the public.

17.     Chapman, through ACM, loaned funds to borrowers who in turn posted collateral with ACM in the form of securities.  ACM typically loaned borrowers a percentage of the securities' value.  After a period of time, the borrower had the right to receive back his or her securities or the net appreciation if the borrower repaid the balance of the loan plus accrued interest; alternatively, because the "loans" were non-recourse, the borrower could "walk away" at the end of the redemption period having already received up to 90 percent of the value of the securities posted as collateral.  Assuming that all parties to the transaction performed under the Contract, the borrower's downside risk was capped at the difference between the loan and value of the securities at the inception of the Contract, *i.e.* 10 percent if the loan was for 90 percent of the value of the securities posted as collateral.

18.     In 2004, Chapman formed AF to offer the Stock-Based Loans to California residents.

19.     In practice Chapman and the ACM Entities did not routinely maintain a separation between AF borrowers and ACM borrowers.  For example, in some instances, portfolios transferred by borrowers pursuant to AF Contracts and loan repayments under those agreements were deposited into ACM brokerage and/or financial accounts.  Moreover, Chapman, on occasion, corresponded with AF borrowers as a representative of ACM.

20.     The vast majority of the business of the ACM Entities' was generated through the efforts of third-party entities.  In July 2001, Chapman and ACM entered into an agreement with Stock Loan Solicitor I and Stock Loan Solicitor II (collectively, the "Stock Loan Solicitors") under which the Stock Loan Solicitors would advertise the Stock-Based Loans to the public and introduce potential borrowers to ACM.  In return, ACM paid the Stock Loan Solicitors a referral fee based on the ultimate loan amount.  Upon the formation of AF, AF also solicited borrowers through the Stock Loan Solicitors.

21.     From in or around 2002 through in or around June 2009, the ACM Entities entered into Contracts with more than 350 borrowers and collectively accepted approximately $270 million in securities as collateral from borrowers in connection with the Stock-Based Loans.

22.     In or around September 2002, Chapman hired the Employee and directed him to create a database that documented the Contracts executed by the ACM Entities, including the particular securities each borrower delivered to the ACM Entities as collateral, and the amount loaned to the borrower by the ACM Entities at the Contract's inception.

23.     In addition, the database tracked the current value of the securities posted as collateral by the borrower, the dividends generated for each security, the interest accrued on the Stock-Based Loans, and the maturity dates of those loans.  The database maintained this information on an ongoing basis to determine if, and by how much, each borrower's securities had appreciated and thus, whether and how much money the ACM Entities would owe the borrower at the end of a Contract term.  The Employee frequently sent Chapman updates from the database, setting forth the liabilities of the ACM Entities to their borrowers.

24.     The ACM Entities also sent borrowers quarterly reports, which provided summary details as to their loans and the performance of the securities posted as collateral for each Stock-Based Loan.  These quarterly reports described the current value of the securities, the amount of interest that had accrued, and any "dividends" received on those securities.  The ACM Entities sent these quarterly reports to each borrower by means of interstate commerce, including the mails and by wire.

**B.      *The Contract Terms***

25.     The Contracts documenting the Stock-Based Loans, which Chapman helped draft and ultimately approved, evolved over time.  Either Chapman, or the Employee at Chapman's direction, signed each Contract on behalf of the ACM Entities.  In general, borrowers transferred to ACM or AF securities as collateral for a loan that was typically equal to 85 to 90 percent of the value of the portfolio.  The Defendants offered borrowers four options at the end of the loan term, which was typically between two and seven years:  (1) repay the loan plus accrued interest and receive back the securities pledged as collateral for the loan; (2) instruct the ACM Entities to remit to the borrower the net appreciation; (3) roll over the current value of the pledged securities into another loan; or (4) walk away from the transaction without further obligation.

7

26.     Borrowers typically received their "loan" payment shortly after entering into a Contract.  They were purportedly protected against any risk from the value of their portfolio decreasing by more than the loan discount (typically 10 to 15 percent) because they were under no obligation to repay the loan.  Further, borrowers were purportedly able to retain any appreciation of the securities posted as collateral if that appreciation was greater than the interest accrued on the loan, either through the return of the securities upon repayment of the loan plus accrued interest or remission of the net appreciation -- a benefit not available if the borrower had simply sold the securities outright instead of signing a Contract for a Stock-Based Loan.  This opportunity to profit, expressly articulated in the Contracts, was a key selling point of the Stock-Based Loans.

27.     The Defendants' obligations at the end of a Contract term were expressly set forth in the Contracts, and their agreement to honor those obligations is evidenced by their signatures on those Contracts.  Indeed, in many Contracts the Defendants set forth the steps they would take to protect the borrower from any default by the ACM Entities.  For example, at least 20 Contracts entered into by ACM after June 2006, contained the following language:

> If for any reason ACM (or any rightful successor or assign to this Agreement) is unable to fulfill its obligation to return said shares, Client will have the right to purchase back all of the shares from a counterparty that is "Investment Grade" as defined by Moody's Investor Services ("Counterparty") for a price that will approximately equal the loan principal plus accrued interest and the Cap Differential Amount.  Specifically, ACM warrants that a private contract will be entered into with such Counterparty providing ACM with the option to obtain said shares for the above-referenced price.  On such private contract, ACM will explicitly name Client as Secondary Beneficiary, allowing Client to bypass ACM entirely should such unforeseen circumstances arise.

28.     In other Contracts, ACM or AF (referenced disjunctively herein as the "ACM

Entity") agreed to "hedge" against portfolio losses, often through "arrangements" with

investment-grade counterparties that, by the Contract's terms, would be established before the

loan amount was distributed at the outset to the borrower.  For example, certain Contracts

entered into by ACM and AF after June 2006, provided:

> [The ACM Entity] shall confirm by fax, phone or electronic mail
> the receipt and current market value of the Stock to Cash Loan
> Portfolio.  Once confirmed, [the ACM Entity] shall proceed with
> hedge arrangements through investment-grade counterparties and
> remit to the Client the Net Loan Proceeds based on the loan-to-
> value ratio ("LTV"), as indicated in the subsequent Stock to Cash
> Addendum(s), multiplied by the Stock to Cash Loan Portfolio
> value at the time of hedging.  [The ACM Entity] shall also send to
> Client a statement indicating such hedged value,  … In the event
> hedge arrangements are only available through counterparties rated
> below investment-grade, [the ACM Entity] shall obtain client's
> authorization prior to hedging.

29.     These same Contracts expressly stated that the underlying securities posted as

collateral by the borrower would be returned to the borrower if a hedge could not be timely

obtained to ensure the ACM Entities' ability to perform at the end of the Stock-Based Loan term:

> Client understands that [the ACM Entity's] ability to provide
> financing depends on [the ACM Entity] finding appropriate
> counterparties and executing timely agreements.  [The ACM
> Entity] will make best efforts to procure a hedge within forty-eight
> (48) hours.  [In some cases] the execution of these contracts may
> take longer than three (3) business days.  During this time, the
> market value of the underlying asset to be hedged may drop in
> value affecting the amount of Net Loan Proceeds.  Additionally,
> [the ACM Entity] will be responsible only for remitting funds
> against a hedged value when obtained.  If it appears that a hedge
> cannot be obtained, or may take unusually long, [the ACM Entity]
> shall return all securities to Client.

30.     During the relevant time period, Chapman assured Principal I and Principal II,

each of whom were soliciting borrowers for the Defendants through the Stock Loan Solicitors,

that the Defendants separately hedged each borrower's portfolio through options trading to

ensure that the ACM Entities could honor contractual commitments when a Stock-Based Loan

matured.

31.     For instance, in a January 2006 e-mail to Principal II, who had requested further

information on the Defendants' hedging to provide to a possible borrower, Chapman stated, in

relevant part:

> Here are the points I think you want to know:  When I create a
> typical collar and loan, I do the following:  1. purchase a put at the
> money[;] 2. sell a call out of the money[;] 3. take the financing at
> whatever rate I can get[;] 4. pledge the shares to the lender.  …
> The counterparty with respect to each step where ACM would
> have market risk (and even the sold call, although I don't think that
> matters) is investment grade as Moody's would define it.  The
> counterparty would be the OCC, Societe Generale, Deutsche Bank,
> CSFB, Wachovia Securities, Bank of New York, Goldman Sachs,
> or a few others which I might use from time to time.

32.     Chapman made similar representations to the Employee regarding purported

hedging.

33.     At all times, Chapman knew or was reckless in not knowing that these

representations to the Stock Loan Solicitors and the Employee would be communicated to

potential borrowers.

34.     In August 2003 and September 2007, the Employee and his wife, and Principal II,

respectively, entered into Contracts with ACM for Stock-Based Loans.

## C.    *The Demise of the ACM Entities*

35.     Had the Defendants retained the transferred portfolios, funding loans from

reserves, institutional borrowing or other sources, the Defendants could have satisfied their

obligations to borrowers as they came due.  However, the Defendants did not have sufficient

reserves or other assets from which they could fund the loans.  Rather, in most if not all cases the

10

Defendants immediately sold the securities posted by borrowers as collateral for the Stock-Based Loans. Defendants then remitted up to 90 percent of the sales proceeds to the borrower as the "loan" and used the remainder to pay commissions to third-parties such as the Stock Loan Solicitors, meet obligations under maturing Contracts with other borrowers, pay operating costs such as Chapman's salary, and otherwise for the Defendants' benefit.

36. By June 2006, the Defendants were making no effort, aside from procuring new Contracts, to generate income to pay maturing Stock-Based Loan obligations, hedge against an advancing market, or otherwise ensure their ability to satisfy Contracts as they matured.

37. With minimal cash reserves, no income, and no securities to hedge against their obligations, the ACM Entities' ability to perform under the Contracts if the securities posted by borrowers as collateral appreciated in value was entirely dependent on funds from new Stock-Based Loan borrowers.

38. Because many of the Stock-Based Loans matured after several years, the ACM Entities' obligations to repay borrowers did not begin to arise in earnest until in or around 2005.

39. By early 2007, the ACM Entities did not have enough funds to cover their outstanding obligations to borrowers. Chapman began renegotiating payment terms with several borrowers to delay or defer payments, at one point mortgaging personal assets to repay certain borrowers. The Defendants did not disclose these facts to potential borrowers or the Stock Loan Solicitors while continuing to offer Stock-Based Loans to new borrowers and entering into new Contracts. During this time, Chapman also continued to disburse funds from the ACM Entities to himself for his personal benefit and to repay personal debt obligations including automobile loans and credit cards.

11

40.     In or around April 2008, Chapman informed the Employee and Stock Loan Solicitor II that the ACM Entities had "liquidity issues," and that he had a plan whereby he would re-negotiate payment terms with borrowers and use revenue derived from new borrower transactions to help repay the ACM Entities' outstanding obligations to prior borrowers as well as rebuild the ACM Entities' reserve funds.  Shortly thereafter, Stock Loan Solicitor II ceased doing business with the ACM Entities.

41.     With full knowledge of their dire financial condition and the need to use existing proceeds from Stock-Based Loans to pay other borrowers, Chapman and the ACM Entities entered into an additional 40 Contracts through the end of 2009, failing to disclose to borrowers that the ACM Entities were experiencing significant financial difficulties and would likely not be able to return securities or the net appreciation to borrowers at the end of Contract terms.

**D.     *The Defendants Defrauded all Borrowers Who Signed Contracts After June 2006.***

42.     With respect to each Contract signed after June 2006, the ACM Entity that was a party to a Contract, and Chapman, defrauded the borrower.

43.     ACM or AF, and Chapman, misrepresented to the borrower that they would be able to perform under the Contract, at all times knowing or reckless in not knowing, and failing to disclose that their performance under each Contract was entirely dependent on a flat or generally declining stock market, a situation that would generate no demands for the return of portfolios or net appreciation; or, alternatively, the continued influx of proceeds from new Stock-Based Loans.  These were material facts that the Defendants knew or were reckless in not knowing, and the omitted facts were necessary to make the statements made to borrowers in the Contracts, in light of the circumstances under which they were made, not misleading.

44.     With respect to Contracts signed from, at least, mid-2007, the ACM Entities and Chapman further failed to disclose to borrowers and potential borrowers the increasing financial difficulties faced by the ACM Entities, including that the ACM Entities did not have enough funds to cover their outstanding liabilities; and that, as time progressed, the payment terms of several Contracts had been renegotiated at or around maturity, that Chapman had mortgaged his personal assets in order to repay money owed to borrowers, and that the ACM Entities had serious liquidity issues. Chapman and the ACM Entities also failed to disclose that, because of these financial difficulties, they continued to use funds received from the liquidation of new collateral from new borrowers to pay off maturing obligations to other borrowers and for Chapman's own benefit, such as to pay off his personal debt obligations. These were material facts that the Defendants knew or were reckless in not knowing, and the omitted material facts were necessary to make the statements made to borrowers, in light of the circumstances under which they were made, not misleading.

45.     Moreover, upon signing certain Contracts after June 2006, the ACM Entities and Chapman misrepresented to the borrowers that they would enter into agreements with third-parties to enable borrowers to repurchase securities posted as collateral for a Stock-Based Loan from a counterparty at a set price if the ACM Entity was unable to honor the Contract with the borrower. In fact, at the time they entered into Contracts containing this representation, the ACM Entity involved and Chapman knew or were reckless in not knowing, that they would not, and could not, secure such agreements from third-parties. In fact, the Defendants did not enter into any such agreements.

46.     Similarly, upon signing certain Contracts after June 2006, the ACM Entities and Chapman misrepresented to those borrowers that they would make hedging arrangements with

13

investment grade counterparties to protect against portfolio losses, knowing, or reckless in not knowing that they were not making, and would not make, any such arrangements.

47.     Both Principal II and Employee entered into Stock-Based Loan Contracts with Defendant ACM.  Prior to entering into their Contracts, Chapman misrepresented to Principal II and Employee that he was purchasing options as a hedge against the potential that the specific securities pledged as collateral would have to be returned, at all times knowing or recklessly disregarding the fact that neither he nor ACM was purchasing securities correlated to any particular securities pledged as collateral.

48.     All of the misrepresentations and omissions set forth above were of material facts, both individually and in the aggregate.  There is a substantial likelihood that a reasonable borrower would consider the misrepresented facts and the omitted information important, and/or that disclosure of the omitted facts or accurate information would alter the "total mix" of information made available to the borrowers.  With respect to omitted facts, their omission made the statements made by the Defendants, in light of the circumstances under which they were made, misleading, and the Defendants had a duty to disclose such facts.

49.     At all times relevant to this Complaint, the Defendants, and each of them, acted knowingly and/or recklessly, including in the making of the material misstatements and the omission of material facts as further described above.

50.     As a result of the conduct described herein, borrowers have lost millions of dollars.

**E.      *Additional Acts of Fraud Relating to Loan Repayments in 2008.***

### *Borrower 1*

51.     In or around May 2005, Borrower 1 entered into a three-year Contract with AF that would mature in June 2008.  Pursuant to the Contract, Borrower 1 transferred to AF

securities of Agilent Technologies Inc. and Hewlett-Packard Co., collateral valued at
approximately $155,000, in exchange for a loan in the amount of $139,517, or approximately 90
percent of the collateral's value.

52.     The value of Borrower 1's securities pledged as collateral for her Stock-Based
Loan increased significantly over the period of the loan.  By May 2008, those securities were
valued at approximately $330,000.

53.     In or around May 2008, Borrower 1 timely notified AF and Chapman of
Borrower 1's intent to repay the Stock-Based Loan and seek return of the securities posted as
collateral, consistent with the first option in Borrower 1's Contract.  Shortly thereafter, Borrower
I asked Chapman and AF for extra time to liquidate other holdings in order to repay the loan.

54.     In an e-mail dated May 30, 2008, Chapman, on behalf of AF, acknowledged
Borrower 1's request, and agreed to allow her extra time to repay the loan, stating that he would
honor her "request not to cash the stock" for a few weeks to allow for repayment.  In a
subsequent email dated June 13, 2008, Chapman projected Borrower 1's loan balance to be
$181,976.99.

55.     On or about June 17, 2008, Borrower 1 wired $181,976.99 to an ACM bank
account, satisfying Borrower 1's obligation under her Contract and entitling her to the return of
the securities posted as collateral.

56.     Chapman and AF accepted Borrower 1's repayment but did not satisfy AF's
obligation to Borrower 1 in any manner.  Instead, after receiving the repayment, Chapman and
AF used the funds to pay obligations to other Stock-Based Loan borrowers to whom the ACM
Entities owed money.  By approximately mid-July 2008, Chapman and the ACM Entities had
used Borrower 1's repayment amount in its entirety to pay other borrowers.

57.     In or about July and August 2008, Borrower 1's representatives contacted AF about the status of the return of Borrower 1's securities and received no answer. In or around September 2008, Chapman sent an e-mail to Borrower 1's investment adviser, stating that "ACM currently has temporary liquidity issues that have prevented us from successfully closing their transaction in the normal expected timeframe. We have been dealing with these issues over the summer and I feel comfortable that we will be able to deliver by the end of September."

58.     On or about September 16, 2008, Borrower 1's son demanded immediate release of the securities. In or about October 2008, Chapman sent an e-mail to Borrower 1 stating that he had no timeframe for the return of the shares, but that "it is possible that it will be within the next 2-4 weeks." On or about December 1, 2008, Chapman sent an e-mail to Borrower 1's son, stating that "we have seen a significant increase in activity over the past few weeks. If we are not able to make [Borrower 1] whole before the end of the year, we should at least be able to make a very substantial payment."

59.     To date, Borrower 1's securities have not been returned, nor has she received payment for the same.

### *Borrower 2—The Trust*

60.     In or around December 2003, a second borrower, a trust (the "Trust") entered into a five-year Contract with ACM with a maturity date in December 2008. Pursuant to the subject Contract, the Trust transferred 39,000 shares of Exxon Mobil stock, valued at approximately $1.5 million, to ACM for a cash loan of, approximately, $1.4 million.

61.     In or around November 2008, the trustee of the Trust (the "Trustee") timely notified ACM of the Trust's intent to repay the loan and receive back the securities posted as collateral, which had significantly increased in value to approximately $3 million.

62.    By letter dated on or about December 8, 2008, ACM, through Chapman, acknowledged the Trustee's request, stating that it had received the Trustee's "maturity notification letter indicating [the Trust's] intent to repay the loan with cash and subsequently receive delivery of" the portfolio. In the letter, ACM, through Chapman, stated that in order to receive return of the securities posted as collateral, the Trustee had to wire the ending loan balance of $1,950,052.62 to ACM's bank account by the end of the month.

63.    On or about December 29, 2008, the Trustee timely transmitted $1,950,052.62 by wire transfer to ACM's bank account, satisfying in full the Trust's obligation to repay the loan, and obligating ACM to return the Trust's securities.

64.    By letter dated January 7, 2009, ACM, through Chapman, acknowledged receipt of the Trust's payment and stated that ACM was "preparing to return any remaining portfolio shares or excess cash to [the Trust's] designated account via electronic transfer." The "Stock to Cash Final Report" included with the letter indicated the "remittance due" to the Trust upon payment of $1,950,052.62 to be $3,113,370.

65.    In or around January 2009, Chapman and ACM used approximately $50,000 of the funds remitted by the Trustee to ACM for Chapman's personal expenditures, including a payment of $15,000 for a Turks and Caicos condominium, a payment of $5,284.33 to Wachovia Bank for a personal consumer loan, and a transfer of $25,000 to Chapman's personal bank account, a large portion of which Chapman used toward his monthly mortgage payment on his home in Great Falls, Virginia.

66.    During January 2009, the Trustee, through her attorneys, made numerous inquiries about the return of the Trust's securities. Chapman first responded that the shares would be returned within one or two weeks, and later indicated that he expected the shares to be

returned by January 23, 2009, at all times knowing or reckless in not knowing that ACM did not

hold the shares due, and had neither the means nor the ability to tender all the shares back to the

Trust. Regardless, in a series of e-mail communications beginning on or about January 29, 2009,

Chapman told the Trustee that "the stock reside[d] in ACM's broker dealer account" and that the

delay in returning the shares to the Trustee was because the shares were "encumbered."

67.     On or about January 29, 2009, Chapman transferred $1,900,000 of the Trust's

remitted funds from ACM's bank account to Chapman's brokerage account and purchased

24,000 shares of Exxon Mobil stock. On or about February 6, 2009, Chapman remitted 23,000

of these shares to the Trust.

68.     On or about February 23, 2009, Chapman sold the remaining 1,000 shares of

Exxon Mobil stock in his brokerage account, generating proceeds of $71,609.01, which he

transferred to ACM's bank account. Chapman and ACM subsequently used these proceeds to

repay other borrowers and for a variety of Chapman's personal expenses.

69.     The Trust never received the remaining 16,000 shares of Exxon Mobil stock,

valued in November 2008 at approximately $1.3 million.

### *The Defendants Defrauded Borrower 1 and the Trust*

70.     Chapman, and AF and ACM, respectively, defrauded, directly or indirectly,

Borrower 1 and the Trust by making untrue statements of material fact and by omitting material

facts necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading.

71.     AF and Chapman knowingly or recklessly misrepresented to Borrower 1 that AF

held the underlying securities by indicating that it would honor her request "not to cash the

stock" for a few weeks while she repaid the loan. They further knowingly or recklessly failed to

inform Borrower 1 that AF had, in fact, immediately liquidated the securities posted as collateral

18

for Borrower 1's Stock-Based Loan; never repurchased the shares; could not, at the time the misrepresentations were made, repurchase the shares or otherwise return the value of the collateral; and instead would use her repayment to pay other borrowers. Each of these facts was material.

72.     The fraud continued through the ACM Entities' use of Borrower 1's loan repayment to pay the Defendants' obligations to other borrowers and Chapman's additional misrepresentations, through late fall and winter of 2008, of future performance when the Defendants had no means to perform under Borrower 1's Contract.

73.     Similarly, in connection with the Trust's Stock-Based Loan repayment, ACM, through Chapman, directed the Trustee to wire the loan repayment to ACM, knowingly or recklessly failing to disclose that it no longer held the securities posted as collateral, did not have the means to honor ACM's obligations under the Trust's Contract, and that ACM and Chapman would use at least part of the remitted payment for Chapman's personal benefit before ACM's obligations under the Trust's Contract had been satisfied. Each of these facts was material.

74.     The fraud continued through Chapman's use of the Trust's loan repayment for his own benefit, and ACM's misrepresentations and omissions regarding its future performance on the Trust's Contract and its possession of the Exxon Mobil stock, when ACM and Chapman had no means to perform under that Contract.

# I.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (Against All Defendants directly)

75.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 74, inclusive, as if they were fully set forth herein.

76.     The conduct described herein was in connection with the purchase or sale of securities.

77.     The Defendants, by engaging in the conduct described above, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

       (a) employed devices, schemes or artifices to defraud;

       (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

       (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

78.     By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5].

79.     Defendants will, unless enjoined, continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5].

## II.

### SECOND CLAIM FOR RELIEF

### Controlling Person Liability Under Section 20(a) of the Exchange Act (Against Defendant Chapman)

80.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 79 inclusive, as if they were fully set forth herein.

81.     In addition to his liability under Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5], Defendant Chapman is also liable as a controlling person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

82.     Defendant Chapman is, or was at the time acts and conduct set forth herein were committed, directly or indirectly, a person who controlled Defendants ACM and AF.  As set forth above, Defendants ACM and AF violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5].

83.     Chapman exercised actual power and control over Defendants ACM and AF, including authority to execute Contracts on behalf of ACM and AF with borrowers for Stock-Based Loans, and signatory authority on Defendants ACM and AF's bank accounts.

84.     By reason of the foregoing conduct, Chapman is jointly and severally liable with, and to the same extent as, Defendants ACM and AF, which he controlled, for violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter final judgment:

### **I.**

Permanently restraining and enjoining the Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5];

### **II.**

Ordering each Defendant to disgorge any and all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

### **III.**

Ordering each Defendant to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

### **IV.**

Retaining jurisdiction of this action for purposes of enforcing any final judgments and orders; and

## V.

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Date:     September 26, 2013

BY: _____
Catherine E. Pappas (56544)
G. Jeffrey Boujoukos
Kingdon Kase
Jack Easton

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
 701 Market Street, Suite 2000
Philadelphia, PA 19106
(215) 597-3100 (Office)
(215) 597-2740 (Fax)
**pappasc@sec.gov**

OF COUNSEL:

Daniel M. Hawke