**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **CIVIL ACTION** |
| Plaintiff, | |
| **v.** | |
| | **NO.  13-5648** |
| **WILLIAM DEAN CHAPMAN, JR., ALEXANDER CAPITAL MARKETS, LLC, and ALEXANDER FINANCIAL, LLC,** | |
| Defendants. | |

**DuBois, J.**                                                                                    **January 19, 2021**

**M E M O R A N D U M**

## I.     INTRODUCTION

On May 23, 2013, *pro se* defendant William Dean Chapman, Jr. pled guilty to a one-count information, charging wire fraud in the United States District Court for the Eastern District of Virginia.  Based on the same conduct that gave rise to Chapman's criminal conviction, on September 26, 2013, plaintiff Securities and Exchange Commission ("SEC") commenced this civil action against Chapman, Alexander Capital Markets, LLC ("ACM") and Alexander Financial, LLC ("AF") (collectively, "ACM Entities") for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  The SEC also contends that Chapman, as a control person of the ACM Entities, violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Presently before the Court is Plaintiff's Motion for Summary Judgment Against All Defendants.  For the reasons set forth below, the Motion is granted as to Chapman.

On April 2, 2015, the Clerk of Court entered a default against the ACM Entities for failure to appear, plead or otherwise defend.  To date, the SEC has not moved for default

judgment against the ACM Entities pursuant to Federal Rule of Civil Procedure 55.  With the case in that posture, the Court concludes that the SEC's Motion for Summary Judgment should be treated as a motion for default judgment and granted.  *See SEC v. Cooper*, 142 F. Supp. 3d 302, 307 n.1 (D.N.J. 2015).

## II.      BACKGROUND[1]

"Chapman formed ACM in 2001 to offer loans to borrowers."  Pl.'s Statement of Undisputed Mat. Facts ("Pl.'s SUMF") ¶ 9.  "In or around 2004, Chapman formed AF to offer loans to borrowers in California and to comply with California insurance reporting and regulatory requirements."  *Id*. ¶ 10.  "Chapman owned, controlled, and held himself out as the President" of both ACM and AF.  *Id*. ¶¶ 9-10.

### A.  Chapman's Criminal Action

"On May 23, 2013, the United States Attorney for the Eastern District of Virginia filed an Information charging Chapman with one count of wire fraud for his role in the scheme to defraud the customers of the ACM Entities, in violation of 18 U.S.C. § 1343."  *Id*. ¶ 3 ("Criminal Action").  That same day, Chapman pled guilty to the wire fraud charge and was sentenced to 144 months' incarceration and ordered to pay $34,742,925 in restitution.  Crim. Judgment, Pl.'s Ex. 5.  In connection with his guilty plea, Chapman admitted the following facts.

Borrowers transferred securities to the ACM Entities as collateral for loans.  Guilty Plea Statement of Facts ("Guilty Plea SOF") ¶ 3.  In return, defendants gave borrowers loans equal to 85 or 90 percent of the value of the securities.  *Id.*  Upon maturity of the contracts which governed their transactions with defendants, borrowers were given the following options,

---

[1]      Chapman did not submit a statement of material facts in opposing the SEC's Motion.  Nevertheless, the facts are presented in the light most favorable to him, the non-moving party.  Disputed facts are noted as such. Where appropriate, the SEC's statement of undisputed material facts is cited in lieu of a direct citation to the record.

"(1) repay the loan plus accrued interest and receive back the securities pledged as collateral for the loan, (2) instruct the ACM Entities to remit to the borrower portfolio profits in excess of accrued interest . . . , or (3) walk away from the transaction without further obligation."  Pl.'s SUMF ¶ 14.  "Defendants assured borrowers that the ACM Entities were engaged in hedging transactions to protect against adverse market movements, and that at the end of the loan period, ACM would be able to return either the full value of the customers' securities or the cash equivalent."  *Id.* ¶ 15.  "In many cases, however, [defendants] simply sold the customers' securities upon receipt, remitted up to 90% of the sales proceeds to the customers as the 'loan,' paid commissions to [third-party marketers], and retained the remaining sales proceeds in reserve for investments and for [defendants'] use."  Guilty Plea SOF ¶ 3.  "Chapman [often] used funds generated from newer client transactions to repay the maturing client obligations."  *Id.* ¶ 8.

In or about March 2008, defendants lacked sufficient funds to buy back securities or provide the equivalent cash value of those securities to cover their outstanding liabilities.  *Id.* ¶ 3. Nevertheless, defendants continued to solicit and accept borrowers' securities in exchange for loans throughout 2008 and 2009.  *Id.*

Chapman further admitted to defrauding specific borrowers, identified as "Victim 1" and "Victims 2 and 3."[2]  Victim 1 transferred shares to defendants, which were valued at approximately $155,000, and in return received a loan for 90% of their value.  *Id.* ¶ 12.  In the spring of 2008, Victim 1 offered to pay the loan balance in cash, thereby entitling her to the return of her shares.  *Id.* ¶ 14.  At defendants' instruction, "[o]n or about June 17, 2008, Victim 1 wired $181,976.99 to ACM's bank account satisfying in full her repayment of the loan and entitling her to the return of her shares, which had increased in value over the three year loan

---

[2]     Victim 2 obtained the initial loan from defendants but died before his contract with defendants matured. His widow, Victim 3 later sought the return of their shares from defendants.  Guilty Plea SOF ¶ 24.

term to approximately $330,000." *Id.* ¶ 16.  Over the course of several months, Chapman, through a series of emails, continued to reassure Victim 1 that her shares would be returned, citing "liquidity issues" and "a significant increase in activity" as reasons for the delay.  *Id.* ¶¶ 19-20.  "Ultimately, [defendants] made no payments to Victim 1, nor returned any portion of her shares," "netting $181,976.99 in fraudulent returns."  *Id.* ¶ 20; Pl.'s SUMF ¶ 46.  Chapman also admitted that, through a similar course of dealing, defendants "nett[ed] $102,232 in fraudulent returns" from Victims 2 and 3.  Pl.'s SUMF ¶ 46.

**B. Chapman's Repeated Challenges to his Guilty Plea**

On December 2, 2013, Chapman filed a motion in the United States District Court for the Eastern District of Virginia to withdraw his guilty plea on the ground that it was coerced.  *United States v. Chapman*, No. 13-233 (E.D. Va.) (Document No. 46).  The court denied his motion.  *Id.* (Document No. 50).  Chapman appealed and on July 11, 2014, the United States Court of Appeals for the Fourth Circuit affirmed Chapman's conviction and sentence.  *United States v. Chapman*, No. 13-4956 (4th Cir.).  Chapman's subsequent motion for *en banc* review and petition for writ of *certiorari* to the United States Supreme Court were denied on August 12, 2014 and December 15, 2015, respectively.  *Id.* (Document Nos. 38 & 42).

On December 22, 2015, Chapman filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, asserting that his guilty plea was not voluntary because, *inter alia*, he received ineffective assistance of counsel.  *Chapman*, No. 13-233 (E.D. Va.) (Document No. 68).  By Memorandum and Order dated July 28, 2017, the United States District Court for the Eastern District of Virginia denied Chapman's § 2255 motion, determining that Chapman had not presented "extraordinary circumstances" sufficient to overcome Chapman's sworn statements during his Rule 11 hearing.  *Id.* (Document No. 86) (citing *United States v. Lemaster*, 403 F.3d

216, 221 (4th Cir. 2005)).  On January 10, 2018, the Fourth Circuit dismissed Chapman's appeal. *Id*. (Document No. 100).  Chapman subsequently moved for reconsideration of the district court's denial of his motion to vacate.  By Order dated April 5, 2019, the United States District Court for the Eastern District of Virginia denied that motion and the Fourth Circuit dismissed his subsequent appeal.

On the present state of the record in Chapman's criminal proceedings in the Eastern District of Virginia, his guilty plea has not been vacated.  It is binding on the parties and on this Court.

### C.  Procedural History of this Case

Following Chapman's criminal conviction, on September 26, 2013, the SEC filed a Complaint in this Court against Chapman and the ACM Entities.  At Chapman's request, the Court stayed the case from January 7, 2014 to March 16, 2015, pending the resolution of Chapman's criminal appeals.  On May 1, 2015, the SEC filed a Motion for Summary Judgment Against All Defendants.  Document No. 22.  Chapman responded on August 6, 2015.  Document No. 24.  The SEC replied on August 11, 2015.  Document No. 25.

By Order dated April 28, 2016, the Court again granted Chapman's request for a stay— this time, pending the resolution of his § 2255 motion, filed in the Eastern District of Virginia. Document No 45.  On September 3, 2020, in light of the SEC's letter dated June 22, 2020, reporting that Chapman's § 2255 motion and subsequent appeals to the Fourth Circuit had been denied, the Court transferred the case back to its active docket.  The same day, Chapman filed a

Motion to Deny Summary Judgment and (1) Dismiss or (2) Allow Discovery.[3]  Document No. 63.  On September 28, 2020, the SEC filed a Supplemental Memorandum of Law in Support of its Motion for Summary Judgment and in Opposition to Defendant Chapman's Motion to Dismiss or for Discovery.  Document No. 67.  Chapman responded and the SEC replied. Document Nos. 68; 69.  The Motion is thus ripe for decision.

## III.    LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material when it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.*  In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment[] and resolve all reasonable

---

[3]    Although Chapman requests dismissal of this case in his Motion to Deny Summary Judgment and (1) Dismiss or (2) Allow Discovery, the Motion is more appropriately characterized as a response to the SEC's Motion for Summary Judgment.  As in his other responses, the Motion focuses entirely on undermining the reliability of his guilty plea, upon which the SEC relies in its Motion for Summary Judgment.  He also accuses the SEC of acting in bad faith on the ground that it "is fully aware that the 'facts' in the plea agreement are untrue."  Mot. Deny Summ. J., 11.  Chapman identifies no other basis for dismissing this case.  Accordingly, to the extent that Chapman seeks dismissal of the case in the Motion, it is denied.  The Motion is also denied to the extent it seeks discovery on the ground that Chapman is bound by the record in his criminal proceedings and therefore discovery is inappropriate. However, the Court considers Chapman's Motion insofar as it presents his argument in opposition to the SEC's Motion for Summary Judgment.

inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

## IV.   APPLICABLE LAW

The SEC seeks summary judgment in this civil enforcement action against all defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and against Chapman for violations of Section 20(a) of the Exchange Act. Section 10(b) of the Exchange Act makes it unlawful to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful to, in connection with the purchase or sale of any security, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5(b).

Additionally, "Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b)." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006); 15 U.S.C. § 78t(a). To demonstrate secondary liability under Section 20(a), a "plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 284. A plaintiff must also prove "that the defendant was a culpable participant in the fraud." *Id*. at 284 n.16 (citation omitted); *see also In*

*re Goodyear Tire & Rubber Co.*, 1993 WL 130381 at \*21-22 (E.D. Pa. Apr. 22, 1993) (DuBois, J.).

V.     **DISCUSSION**

A.  **Summary Judgment Against Chapman**

The SEC argues that it is entitled to summary judgment against Chapman on the basis of the issue preclusive effect of his guilty plea in the criminal case, or in the alternative, that there is no genuine dispute of material fact based on the Statement of Facts to which he admitted during his plea colloquy.  In response, Chapman contends that the plea agreement was obtained through fraud, duress and prosecutorial misconduct and challenges the veracity of the Statement of Facts incorporated into his plea agreement.  For the following reasons, the Court determines that Chapman is estopped from challenging the facts underlying his criminal conviction and that he fails to raise a genuine dispute of material fact with respect to any of the SEC's claims.

i.     *The Preclusive Effect of Chapman's Criminal Conviction*

Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."  *Montana v. United States,* 440 U.S. 147, 153–54 (1979).  Additionally, "[w]here, as here, a conviction is the result of a guilty plea, its preclusive effect extends to all issues that are necessarily admitted in the plea."  *Anderson v. Comm'r*, 698 F.3d 160, 164 (3d Cir. 2012) (citations omitted).

In opposing the SEC's Motion, Chapman repeatedly contends that the guilty plea and accompanying statement of facts are "untrue and unreliable."  Mot. Deny Summ. J., 6; Def.'s Resp. Supp. Mem., 5.  In his latest response to the SEC's supplemental brief, Chapman again attempts to cast doubt on the reliability of his guilty plea on the ground that he has "filed [in the

8

Eastern District of Virginia] a 60(b) motion to reopen his initial § 2255 motion based on [new] evidence." Def.'s Resp. Supp. Mem., 11. However, as set forth in Part II.B, *supra*, Chapman has had numerous opportunities to challenge his conviction—in the Eastern District of Virginia, the Fourth Circuit, and the United States Supreme Court—and each time he has been unsuccessful.

This Court has afforded Chapman "all reasonable benefit of the doubt," having stayed this case for over four years while Chapman pursued those direct appeals and collateral attacks on his conviction. *SEC v. Parker*, No. CV 15-1535, 2020 WL 6899795, at *1 (W.D. Pa. Nov. 24, 2020). Accordingly, unless and until Chapman's motion pending in the Eastern District of Virginia is resolved in his favor, it has no bearing on this case, and Chapman's guilty plea remains binding on this Court.

Because Chapman pled guilty to criminal fraud charges stemming from the same conduct at issue in this case, he is precluded from contesting most of the facts upon which the SEC relies in proving his liability under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. With respect to the remaining material facts, the Court determines that Chapman has failed to raise a genuine dispute.

   ii. *Chapman's Liability for Securities Fraud*

To establish securities fraud in violation of Section 10(b) and Rule 10b-5, the SEC must show that Chapman (1) used the mails or an instrumentality of interstate commerce, (2) to make a material misrepresentation or a material omission or to use a fraudulent device, (3) in connection with the purchase or sale of securities, (4) with scienter. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). In Chapman's guilty plea, he admitted that he "devised a scheme to defraud and to obtain

money and property by means of materially false and fraudulent pretenses, representations and promises, caused to be transmitted by means of wire communication in interstate commerce writings, signs and signals for the purpose of executing the scheme . . . ."  Guilty Plea SOF ¶ 1. He further admitted that he did so "willfully, knowingly, with the specific intent to violate the law."  *Id.* ¶ 35.  Accordingly, elements one, two and four of the securities fraud claims have necessarily been established by Chapman's guilty plea.  *See SEC v. Chapman*, 826 F. Supp. 2d 847, 854 (D. Md. 2011) (determining that the same three elements of securities fraud were established by a conviction for wire fraud).  The Court therefore evaluates the SEC's evidence only with respect to the remaining element: a "connection with the purchase or sale of securities."

To demonstrate a connection between the fraudulent activity and the purchase or sale of securities, the SEC need not prove that Chapman made a "misrepresentation about the value of a particular security."  *SEC v. Zandford*, 535 U.S. 813, 820 (2002).  Rather, "it is enough that the fraud alleged 'coincide' with a securities transaction."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006).  The SEC contends that "[d]efendants admittedly induced borrowers to pledge securities—stock portfolios—as collateral for loans," and then sold the stock portfolios "to fund the loans and misappropriate the funds for personal use."  Pl.'s Mot. Summ. J., 15.  Chapman admitted to these same facts in his guilty plea.  Guilty Plea SOF ¶ 3.  The Court thus agrees with the SEC that "the connection with securities [] exists both in the pledge of stock as collateral for the loans, and in [d]efendants' immediate sale of the pledged stock."  Pl.'s Mot. Summ. J., 15.  Accordingly, the Court grants the SEC's Motion to the extent it seeks summary judgment against Chapman for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

10

###### iii.    *Chapman's Liability as a Control Person*

The SEC also argues that, under Section 20(a) of the Exchange Act, Chapman is liable as a control person of Section 10(b) violators.  In his answer to the SEC's Complaint, Chapman admitted that he founded, owned and controlled the ACM Entities and he has not presented any evidence to dispute these admissions.  *See* Resp. SEC Compl. ¶¶ 11-13; 18.  Additionally, Chapman admitted in his guilty plea that he was the owner of ACM.  Guilty Plea SOF ¶ 2.  This evidence is sufficient to establish that Chapman controlled the ACM Entities, violators of Section 10(b).  Additionally, by proving Chapman's individual liability under Section 10(b), the SEC has also established that he was "a culpable participant in the fraud."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 at 284 n.16.

For all of the foregoing reasons, the Court grants the SEC's Motion to the extent that it seeks summary judgment against Chapman for violating Section 20(a) of the Exchange Act as a control person.  Chapman is "liable jointly and severally with and to the same extent as" the ACM Entities.  15 U.S.C. § 78t(a).

### B.  Default Judgment Against the ACM Entities

As stated in Part I, *supra*, the Court treats the SEC's Motion against the ACM Entities as one for default judgment.  In considering whether to a grant default judgment under Federal Rule of Civil Procedure 55(b), the Court evaluates three factors: "(1) prejudice to the plaintiff if default is denied; (2) whether the defendant appears to have a litigable defense; and (3) whether defendant's delay is due to culpable conduct."  *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).  The Court determines that the first two factors, in particular, weigh in favor of default judgment against the ACM Entities.

First, further delay of final judgment in this case would significantly prejudice the SEC,

11

which has been awaiting resolution of its pending Motion for nearly six years.  In that time, the

SEC has assembled a voluminous record against defendants and submitted multiple briefs in

support of its Motion.  Additionally, as set forth in this Memorandum, the SEC's evidence

against defendants is compelling.  No potential defenses on behalf of the ACM Entities have

been identified.  Accordingly, the Court grants default judgment against the ACM Entities.  By

virtue of their default, the ACM Entities are liable for securities fraud in violation of Section

10(b) and Rule 10b-5.

### C.  The SEC's Requested Relief

Having determined that defendants are liable for securities fraud, and that Chapman is

liable as a control person, the Court next examines the SEC's request for relief.  In its

supplemental brief, the SEC requests that the Court "(1) enjoin[] [d]efendants from future

violations of the federal securities laws; and (2) order[] [d]efendants to pay disgorgement and

prejudgment interest totaling $646,861, but order[] further that the disgorgement and

prejudgment interest is deemed satisfied by the restitution order in the Criminal Action."  Supp.

Mem. L., 9.  The Court evaluates each of these requests in turn.

#### i.  *Permanent Injunction*

To issue an injunction in a case involving securities violations, a court must determine

that "there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the

illegal conduct.  *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).  This assessment is based

on the totality of the circumstances, including, "the degree of scienter involved on the part of the

defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the

wrongful nature of his conduct, the sincerity of his assurances against future violations, and the

likelihood, because of defendant's professional occupation, that future violations might occur." *Id.* (citations omitted).

As explained in Part V.A.ii., *supra*, Chapman's guilty plea established that he acted with a high degree of scienter in defrauding borrowers, "willfully, knowingly, with the specific intent to violate the law." Chapman's scienter may be imputed to the ACM Entities on the ground that he controlled them. *See Cooper*, 142 F. Supp. 3d at 313 (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003)). Thus, the high degree of scienter attributed to all defendants counsels in favor of an injunction.

Additionally, the recurrent nature of defendants' offenses and Chapman's failure to recognize the wrongful nature of his conduct weigh heavily in favor of an injunction. Defendants defrauded more than 290 borrowers over a two-year period and "realized ill-gotten gains exceeding $7 million."[4] Pl.'s SUMF ¶ 25; Pl.'s Mot. Summ. J., 2. This "continuing course of deceptive conduct consisting of a series of acts, misstatements and omissions over an extended period of time" counsels in favor an injunction. *SEC v. Gallagher*, No. CIV. A. 87-3904, 1989 WL 95252, at *9 (E.D. Pa. Aug. 16, 1989). Further, Chapman's numerous attempts to withdraw and challenge his guilty plea demonstrate that he does not recognize the illegal nature of his actions, nor has he accepted responsibility for them. The Court thus "view[s] the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted." *SEC v. Teo*, No. 2:04-CV-01815 SDW, 2011 WL 4074085, at *8 (D.N.J. Sept. 12, 2011), *aff'd*, 746 F.3d 90 (3d Cir. 2014).

---

[4]    As stated in note 1, *supra*, Chapman did not submit a statement of facts in opposition to the SEC's SUMF. Additionally, in challenging the SUMF, Chapman focuses entirely on undermining the reliability of his guilty plea. Chapman concedes that "[t]he language and allegations of the SEC in that [SUMF] are entirely lifted from William Chapman's plea agreement." Def.'s Resp. Supp. Mem., 6. Given the issue preclusive effect of Chapman's guilty plea, explained in Part V.A.i, *supra*, his challenges to the SUMF are also unsuccessful. Accordingly, the Court treats the SEC's SUMF as undisputed.

Based on defendants' scienter, the recurrent nature of their offenses, and Chapman's failure to recognize the wrongful nature of his actions, the Court determines that it is likely that defendants will violate securities laws in the future absent an injunction. The Court therefore grants the SEC's request for a permanent injunction prohibiting defendants from further violations of Section 10(b), Rule 10b-5, and barring Chapman from further violations of Section 20(a) of the Exchange Act as a control person.

ii.     *Disgorgement and Prejudgment Interest*

The SEC further contends that disgorgement of defendants' ill-gotten gains would prevent their unjust enrichment and deter others from violating securities laws. Pl.'s Mot. Summ. J., 20. However, in light of the fact that the ACM Entities are defunct, and that Chapman already faces a restitution order of $34,742,925 as a result of his criminal conviction, the SEC requests that the Court deem the disgorgement amount satisfied by the larger monetary judgment in the Criminal Action. Pl.'s Supp. Mem. L., 2. The Court agrees with the SEC's reasoning and examines its disgorgement and prejudgment interest calculations for the sole purpose of quantifying the harm caused by defendants' misconduct.

The SEC contends that "throughout the duration of their illegal scheme"—from March 2007 through June 2009— defendants realized more than $7 million in ill-gotten gains. Pl.'s Supp. Mem. L., 11.[5] However, following the Supreme Court's decision in *Kokesh v. SEC*, SEC enforcement actions are subject to a five-year statute of limitations. 137 S. Ct. 1635 (2017). Thus, the SEC may only seek disgorgement for ill-gotten gains obtained by defendants during

---

[5]      Specifically, the SEC contends that during this period, "ACM entered into 219 new loan transactions under which borrowers transferred securities worth $48,111,494 to ACM. ACM paid out $41,909,738 to borrowers as loans, retaining $6,201,756 in ill-gotten gains." Pl.'s SUMF ¶ 44. Additionally, "AF entered into 74 new loan transactions under which borrowers transferred securities worth $9,258,255 to AF. AF paid out $8,190,617 to borrowers as loans, retaining $1,067,638 in ill-gotten gains." *Id.* ¶ 45.

the period from September 27, 2008 through September 26, 2013—the date this action was commenced.  *See* Sec. Koster Decl. ¶ 3.  Defendants had no legitimate operations during this time—"every contract they entered into was done fraudulently, without disclosure of their precarious financial conditions"—therefore, their ill-gotten gains are calculated as the difference between borrower contributions and borrower distributions.  Pl.'s Supp. Mem. L., 12.

In seeking a disgorgement order, the plaintiff has the initial burden of establishing that "its disgorgement figure reasonably approximates the amount of unjust enrichment."  *SEC v. Secure Capital Funding*, No. CIV. 11-916, 2014 WL 1716226, at *1 (D.N.J. Apr. 29, 2014) (citing *SEC v. Lazare Indus., Inc*., 294 F. App'x 711, 714 (3d Cir. 2008)).  Upon plaintiff's showing that the disgorgement figure is reasonable, the burden of proof shifts to the defendant, who must "demonstrate that the disgorgement figure is not a reasonable approximation."  *Secure Capital Funding*, 2014 WL 1716226, at *2.

The SEC submits the declaration of Daniel L. Koster, a Data Analytics Specialist for the SEC, in support of its request for disgorgement.  According to Koster's analysis, during the relevant period, ACM received $3,305,368 from borrowers and repaid $2,859,458, netting $445,910 in ill-gotten gains.  Sec. Koster Decl. ¶ 10.  Additionally, Koster states in his declaration that during this period, AF received $697,793 from borrowers and returned $593,124, netting $104,669 in ill-gotten gains.  *Id*.  Accordingly, "[t]he combined total disgorgement is $550,579."  *Id*.

Koster's figures reasonably approximate the amount that defendants unlawfully obtained from borrowers and Chapman fails to provide any cognizable evidence to demonstrate otherwise. Koster's calculations are based on, *inter alia*, a spreadsheet reflecting defendants' contracts with borrowers and the amounts owed, and documents relating to the agreement with Victim 2,

including a master loan agreement, letters, and emails between ACM and Victim 2. Sec. Koster

Decl. ¶ 3. In disputing the reliability of his guilty plea, Chapman objects generally to some of

the facts upon which Koster relies. However, given the preclusive effect of his guilty plea,

Chapman's objections do not create a genuine issue of material fact. The Court thus determines

that $550,579 is an appropriate disgorgement figure and deems that amount satisfied by the

judgment in the Criminal Action.

The Court further agrees with the SEC that, because defendants retained the benefit of

these ill-gotten gains for several years, the award of prejudgment interest on those gains—

calculated according to the IRS rate for the underpayment of taxes—is appropriate. *See* 26

U.S.C. § 6621(a)(2). Koster's calculations of prejudgment interest on the disgorgement from

ACM's and AF's agreements—$77,978 and $18,304, respectively—are reasonable. Sec. Koster

Decl. ¶¶ 14-15. The Court also deems the prejudgment interest satisfied by the restitution order

in the Criminal Action.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment Against All

Defendants is granted as to Chapman. That Motion, treated as a motion for default judgment

against the ACM Entities, is granted. Judgment is entered against defendants and in favor of the

SEC.

Defendants are permanently enjoined from violating Section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

Chapman is permanently enjoined from violating Section 20(a) of the Exchange Act, 15 U.S.C.

§ 78t(a) as a control person. Chapman and ACM are jointly and severally liable for

disgorgement of $445,910, plus prejudgment interest in the amount of $77,978, for a total of

$523,888, and judgment is entered in favor of the SEC and against Chapman and ACM in that amount.  Chapman and AF are jointly and severally liable for disgorgement of $104,669, plus prejudgment interest in the amount of $18,304, for a total of $122,973, and judgment is entered in favor of the SEC and against Chapman and AF in that amount.  Defendants' obligations to pay disgorgement and prejudgment interest are deemed satisfied by the judgment in the Criminal Action.

An appropriate order follows.